# Court of Appeals, State of Michigan

# ORDER

Valerie Urech v Pioneer State Mutual Insurance Company

Douglas B. Shapiro
Presiding Judge

Docket No. 339784

Jane M. Beckering

LC No. 16-013750 NF

Michael J. Kelly
Judges

The Court orders that the dissenting opinion is hereby AMENDED. The dissenting opinion contained the following clerical error: Page eight, second paragraph from the bottom, the second sentence should read: That is, reasonable minds could differ on whether Urech understood the nature of the documents her son had her sign and whether at the end of the month she could have recalled who assisted her when.

In all other respects, the July 2, 2019 dissenting opinion remains unchanged.

A true copy entered and certified by Jerome W. Zimmer Jr., Chief Clerk, on

JUL 0 9 2019
_____
Date

_____
Chief Clerk

*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

VALERIE URECH,

        Plaintiff-Appellee,

and

JAGANNATHAN NEUROLOGICAL
INSTITUTE PLLC,

        Intervening plaintiff-Appellee

v

PIONEER STATE MUTUAL INSURANCE
COMPANY,

        Defendant-Appellant.

UNPUBLISHED
July 2, 2019

No. 339784
Wayne Circuit Court
LC No. 16-013750-NF

Before: SHAPIRO, P.J., and BECKERING and M. J. KELLY, JJ.

SHAPIRO, P.J., (*dissenting*).

I respectfully dissent. In this no-fault personal protection insurance (PIP) case, defendant Pioneer State Mutual Insurance Company (Pioneer) appeals the trial court order denying its motion for summary disposition under MCR 2.116(C)(10) (no genuine issue of material fact). Pioneer failed to pay sought PIP benefits to the plaintiff-insured following an auto accident from which she claims injury. Plaintiff Valerie Urech (Urech) filed suit and Pioneer sought summary disposition on the basis of policy language providing for rescission in the event of fraud. In its motion Pioneer claimed that there was proof beyond a question of material fact that Urech and her caregivers acted fraudulently in the billing records they completed. The majority concludes, and I agree, that fraudulent action by a caregiver is not grounds for rescission. And because there is a genuine issue of material fact whether Urech engaged in fraud, I would affirm and remand for further proceedings.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

On July 14, 2016, Urech was driving her husband to a doctor's appointment. She claims that she lost consciousness while driving, causing the vehicle to hit a tree.[1] Urech was hospitalized for approximately one week following the crash and claims orthopedic injuries and a traumatic brain injury. After her release, she was prescribed 24-hour per day attendant care and daily replacement services for a 3-month period, later renewed for another 3 months. Urech's son, Brian Urech, and Brian's fiancée, Kelly Haynie (later Urech)[2] agreed to provide that care.

Pioneer does not dispute that it is Urech's no-fault insurer and in first priority to pay her PIP benefits in this case.[3] Nor does it dispute, for purposes of this appeal, that the services prescribed for Urech were reasonably necessary for her care and rehabilitation. On three occasions, Urech's attorney sent letters requesting payment for the attendant care services performed. As proof of loss, enclosed with the letters were forms on which the caregivers recorded the services provided and the hours worked. The form used for July through October 2016 contained a box for each day of the month. The services provided (indicated by a letter code), the hours of attendant care and the person who provided it were written in the box. The testimony from Urech, Brian and Kelly is consistent: they all agreed that Urech did not record the hours or services. At the bottom of the form there were two signature lines—one for the claimant and one for the provider. The forms were all signed by Urech, Brian and Kelly on the appropriate lines. A different form was used beginning in November 2016 when attendant care services began to be provided through McGuffey Home Care (McGuffey), which paid Brian and Kelly as contractors.

In October 2016, Urech filed suit against Pioneer for failure to pay PIP benefits. Pioneer answered and responded with multiple affirmative defenses, including notice that "[i]f proved, Defendant may move to rescind this policy based upon Plaintiff's fraudulent conduct." Pioneer's summary disposition motion was brought under MCR 2.116(C)(10) and alleged that Urech was in violation of the following provision:[4]

---

[1] In the lower court proceedings, Pioneer disputed this version of events and claimed that Urech deliberately crashed the vehicle; however, that factual discrepancy is not relevant to the issues raised on appeal. And when reviewing a motion for summary disposition, we view the facts in the light most favorable to the nonmoving party, which in this case is Urech. See *Klein v HP Pelzer Auto Sys, Inc*, 306 Mich App 67, 75; 854 NW2d 521 (2014).

[2] Kelly married Brian in January 2017. Therefore, at the times relevant to the issue on appeal, she was not Urech's family member as that term is defined by the no-fault policy.

[3] Urech does not seek wage loss benefits.

[4] The provision is in a section of the policy captioned, "General Provisions."

The entire policy will be void if, in obtaining or maintaining this policy, or whether before or after a loss, you, an "insured," a "family member" or any other person seeking coverage has:

1.      Intentionally concealed or misrepresented any material fact or circumstance;

2.      Engaged in fraudulent conduct; or

3.      Made false statements;

relating to this insurance.

The term "void" is not defined in the policy. In the insurance policy setting, the term has the same meaning as "rescind." See *Meemic Ins Co v Fortson*, 324 Mich App 467, 486-487; 922 NW2d 154 (2018).

Pioneer claims that the attendant care forms contained material false statements in that (1) some forms show Kelly providing 12 hours of attendant care daily, however, she admitted in deposition that she was working or caring for her daughter during several if not many of these days, (2) the forms for December 25, 28 and 29, 2016, show Kelly as providing 12 hours of care per day when she was in fact out of town and (3) Brian and Kelly each stated that they provided 6 hours of attendant care on July 17, 2016, a date on which Urech was taken to the hospital, as well as 12 hours of care on July 18, 19 and 20, 2016, dates during which Urech was hospitalized. As to (1) and (2), Brian testified that on the days Kelly was not available he provided Urech with 24-hour care, but he and Kelly listed the time as 12 hours each because they thought they were not supposed to work more than 12 hours at a time. As to the time in the hospital, both Brian and Kelly testified that they were each with Urech for the period claimed and assisting her and there is no evidence to the contrary.[5]

Following oral argument on Pioneer's motion, the trial court concluded that there were questions of fact precluding summary disposition.

## II. ANALYSIS

The majority and I agree that because the caregivers were not "seeking coverage" any fraud committed by them alone, i.e., not the covered individual, does not provide grounds to rescind. Contrary to the majority, however, I conclude there is a question of fact whether Urech

---

[5] Whether attendant care services should be paid for the 4 days during which Urech was hospitalized is not before us. Whether those services were reasonable and necessary can surely be contested. However, assuming the attendant care during hospitalization was not reasonable and necessary, there is no basis in the record to conclude that Brian and Kelly were knowingly attempting to commit fraud by listing those dates. The fact that a claimed benefit need not be paid does not render the claim fraudulent.

committed fraud. I do so for two reasons. First, Pioneer has failed to demonstrate—beyond a question of fact—whether any of the alleged misrepresentations were material. Second, Pioneer has not established—beyond a question of fact—that by signing the forms, Urech acted with fraudulent intent.

## A. MATERIALITY

Pioneer has demonstrated that some of the attendant care forms show Kelly as the care provider for periods when she was not present. However, given Brian's testimony that he was present anytime Kelly could not be and both of their testimony that someone was at Urech's residence available to assist at all times, there is at least a question of fact whether these misstatements were material. If a jury believes that testimony, then the materiality requirement cannot be satisfied because the claimed rate —$8.50 per hour—would still have had to be paid by Pioneer, i.e., Pioneer's duty to pay for attendant care services remains the same regardless of the identity of the caregiver.

Before an insurer may void a policy because of the insured's misrepresentation of a material fact, the insurer must show:

> (1) the misrepresentation was material, (2) that it was false, (3) that the insured knew that it was false at the time it was made or that it was made recklessly, without any knowledge of its truth, and (4) that the insured made the material misrepresentation with the intention that the insurer would act upon it. [*Bahri v IDS Prop Cas Ins Co*, 308 Mich App 420, 424-425; 864 NW2d 609 (2014), (quotation marks and citation omitted).]

"Generally, whether an insured has committed fraud is a question of fact for a jury to determine." *Fortson*, 324 Mich App at 473.

Pioneer has not established beyond a question of fact that there were hours of attendant care claimed when such care was not being provided. Pioneer relies on the fact that the times listed for Kelly were sometimes inaccurate. However, Kelly testified that Brian was always at Urech's house. And when asked why the forms showed that he and Kelly each provided 12 hours of care, Brian explained:

> *Q*. I've marked as Exhibit 3 all the forms for attendant care . . . that you filled out for December. If you'd flip through those and let me know if they're all exactly the same in terms of . . . 9:00 p.m. to 9:00 a.m. for Kelly and 9:00 a.m. to 9:00 p.m. for you?

> *A*. Yes. They would all be the same. Because that's the number that we had chose to put on there. I was there all the time. Kelly was there for most of that time. We didn't mark down that we were both there for 24 hours. So we split 9:00 a.m. to—we split them into 12s so that way she'd have 12 hours and I'd have 12 hours.

> I was told that I'm not supposed to mark down 24 hours . . . .

-4-

*Q.* Who told you that?

*A.* McGuffey.

*Q.* Okay.

*A.* So the reason why we marked down 9:00 to 9:00 is because that's our 12-hour shifts. But I was there 24 hours a day.

*Q.* All right.

*A.* And then—and then sometimes we were both there 24 hours a day but we don't mark down that we were both working for them 24 hours a day.

* * *

*Q.* Was there always somebody in their house with them [i.e., Urech and her husband]?

*A.* Yes.

Brian also testified that no one showed him or Kelly how to fill out the paperwork, that they were doing so to the best of their ability, and if there were errors they were not intentional or intended to obtain payment for periods in which attendant care was not provided.

If we accept the Brian and Kelly's testimony as true, as we must since this is a (C)(10) motion, the only misstatement in the billing form was the identity of the caregiver. However, whether Kelly or Brian provided the attendant care, the cost to Pioneer was the same. In other words, the misstatement had no effect on the care provided or the amount to be paid and so was not material. While the hours of each individual provider should have been accurately listed, it has not been established that this error was for a fraudulent purpose or that it prejudiced Pioneer in terms of the amount of the charges. Brian and Kelly each testified that Urech received 24-hours per day of attendant care. A jury may choose not to credit their testimony, but given the posture of this case, we must accept that testimony as true. And given that testimony Pioneer has not shown "clear, satisfactory and convincing" proof of material fraud. See *Cooper v Auto Club Ins Ass'n*, 481 Mich 399, 414; 751 NW2d 443 (2008) ("Because fraud . . . is not to be lightly presumed, but must be clearly proved by clear, satisfactory and convincing evidence, trial courts should ensure that these standards are clearly satisfied with regard to all of the elements of a fraud claim.") (quotation marks and citations omitted).

My colleagues in the majority agree that materiality is an element that must be shown by an insurer in order to lawfully rescind a policy. However, they conclude that we may not address this issue because it was not raised below or in the briefing to this Court. I cannot criticize my colleagues for their fidelity to principle of judicial restraint, however, in my view Pioneer's failure to address the materiality requirement should not be ignored. It is Pioneer's burden to prove fraud, yet in seeking summary disposition Pioneer provides no explanation, let alone offered proof, that the identity of the particular family caregiver was material. Given that, the

-5-

fact that Urech failed to rebut Pioneer on the issue of materiality should not limit our treatment of the issue. Moreover, it is our duty to review the record de novo.

The failure to have raised the argument below appears to have been due to an assumption that, because the rescission provision speaks to "false statements" in addition to fraud and intentional concealment, the making of a false statement—even if not material—is grounds to rescind. This is incorrect. The caselaw is clear that materiality is a necessary element that must be shown in order to rescind even if it is not so stated in the policy. *Bahri*, 308 Mich App at 424; *Bernadich v Bernadich*, 287 Mich 137, 143-144; 283 NW 5 (1938). In my view, the majority allows the tail to wag the dog when it refuses to consider whether an element of the affirmative defense has been factually demonstrated because of an incorrect legal assumption by the parties that the element was not required. We routinely affirm trial courts on the grounds that they reached the right result for the wrong reason. See e.g., *Lewis v Farmers Ins Exch*, 315 Mich App 202, 216; 888 NW2d 916 (2016).

## B. INTENT

I also conclude that there are questions of material fact whether Urech possessed the requisite intent to commit fraud. Contrary to Pioneer's position, Urech's signature on the submitted attendant care forms is not enough to establish fraud as a matter of law. Further, Urech presented sufficient evidence to create a question of fact about whether she was able to comprehend the forms due to a traumatic brain injury.

"Where an insurance policy provides that an insured's concealment, misrepresentation, fraud, or false swearing voids the policy, the insured must have actually intended to defraud the insurer." *West v Farm Bureau Mut Ins Co of Mich*, 402 Mich 67, 69; 259 NW2d 556 (1977). Intent to defraud requires "something more than mistake of fact or honest misstatements on the part of the insured." *Mina v Gen Star Indemnity Co*, 218 Mich App 678, 686; 555 NW2d 1 (1996), rev'd in part on other grounds 455 Mich 866 (1997). "In cases involving state of mind, such as the scienter requirement in fraud, summary judgment will be appropriate in relatively few instances because it will be difficult to foreclose a genuine dispute over this factual question. *Goldsmith v Moskowitz*, 74 Mich App 506, 518; 254 NW2d 561 (1977) (quotation marks and citation omitted). See also *Pemberton v Dharmani*, 207 Mich App 522, 529 n 1; 525 NW2d 497 (1994) ("[S]ummary disposition is inappropriate where questions of motive, intention or other conditions of mind are material issues.").

Pioneer argues that Urech's signature at the bottom of the form constitutes a guarantee that Brian and Kelly's entries are accurate, and as a result, any inaccuracy by them is considered to have been made by Urech. With this argument Pioneer seeks to avoid the holding on which the majority and I agree; namely that Urech does not lose coverage because of someone else's error or fraud unless she is actively complicit and shares their fraudulent intent. Pioneer's

suggestion that a patient's bare signature on a care provider's record represents approval of the content, *as a matter of law*, is without precedent.[6]

For the same reason, Pioneer's argument that Urech was reckless for not reviewing the record of hours for accuracy, an argument the majority adopts, also fails.[7] First, from a legal standpoint, Urech had no contractual duty to review the form completed by her caregivers for accuracy any more than she would have a duty to review a hospital billing and confirm the nature, dates and times of service. In addition, the form itself does not create such a duty since it contains no language stating or even suggesting that her signature represents that she has reviewed and approved the caregiver's billing forms.[8] When a caregiver commits fraud on the patient's insurer, the insurer's primary remedy is with the caregiver unless the patient was knowingly complicit in the fraud. And when an insurer claims that the patient was knowingly complicit, it is not entitled to summary disposition unless it proves its claim beyond any question of material fact.

Pioneer has also failed to demonstrate a lack of factual dispute regarding Urech's claim that her mental status interfered with her ability to understand and review the forms prepared by Brian and Kelly. In opposing Pioneer's motion for summary disposition, Urech asserted that although she signed the forms, she could not make competent statements whether she had ever reviewed the forms that were submitted because she was diagnosed with a traumatic brain injury and the symptoms of that injury included short-term memory loss. At Pioneer's request Urech underwent a multiple battery of neuropsychological testing as part of an insurance medical examination. The examination included a "validity assessment" of Urech's effort and honesty

---

[6] Perhaps recognizing that the signatures alone are not conclusive proof of their defense, Pioneer's motion below misrepresented the record by claiming on several occasions that the accuracy of the forms were "sworn to" by Urech. A review of the record reveals that no such "swearing" took place.

[7] Urech testified at deposition that she signed the attendant care forms without knowing what they were. She stated, "I didn't look at them. I just signed them." Urech was deposed near the end of discovery, and therefore the trial court did not have her deposition transcript. However, both parties made arguments before the trial court regarding Urech's testimony, and at oral argument they stipulated to the deposition transcript being considered as part of the lower court record on appeal.

[8] Notably, it is well established that when a party relies on recklessness to show fraudulent intent, there is a corresponding requirement that the misrepresentation constitute a *positive assertion*. See e.g., *Bell Isle Grill Corp v Detroit*, 256 Mich App 463, 477; 666 NW2d 271 (2003) ("[W]hen the defendant made the representation, the defendant knew that it was false, *or made it recklessly, without knowledge of its truth and as a positive assertion*[.]") (citation omitted). I am unaware of any Michigan caselaw explaining what constitutes a "positive assertion" for purposes of fraud. But it clearly requires something more than a negligent misrepresentation. And the fact that this requirement exists only for reckless misrepresentations suggests that active, rather than passive, fraud is required in these circumstances.

during the testing. The examining neuropsychologist concluded that "the patient put forth good effort on testing, and we felt that the current testing accurately reflects the patient's current levels of cognitive strengths and weaknesses." As to the effects of the injury, the report concluded:

> On formal cognitive testing, deficits were noted with regard to fluctuating working memory, speed of information processing, verbal learning (initial), visual memory (immediate and delayed), perceptual reasoning, deductive reasoning, integration of multiple bits of information for problem solving, hypothesis testing, impulsivity/cognitive immobility, fine motor control and speed bilaterally, and numerical operations.

A probate court appointed a guardian for Urech in February 2017, which required the court to find by clear and convincing evidence "that the individual for whom a guardian is sought is an incapacitated individual and that the appointment is necessary as a means of providing continuing care and supervision of the incapacitated individual, with each finding supported separately on the record." MCL 700.5306(1).

Viewed in a light most favorable to the nonmovant, the results of the neuropsychological testing, the probate court's determination that Urech is legally incapacitated and the deposition testimony create a material question of fact as to Urech's cognitive status. That is, reasonable minds could differ on whether Urech understood the nature of the documents her son had her sign and whether at the end of the month she could have recalled who her assisted her when. Accordingly, Pioneer has not established as a matter of law that Urech acted with fraudulent intent.

In sum, because there are questions of fact as to the materiality of the alleged misrepresentations and as to Urech's cognitive status, I would affirm the trial court and so respectfully dissent.

/s/ Douglas B. Shapiro